18 A.3d 1054 (2011)
420 N.J. Super. 75
STATE of New Jersey, Plaintiff-Respondent,
v.
Terrence MILLER, Defendant-Appellant.
No. A-6243-07T4.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 2011.
Decided May 10, 2011.
*1055 Stephen A. Caruso, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Caruso, on the briefs).
Dorothy Hersh, Assistant Prosecutor, argued the cause for respondent (Joseph L. Bocchini, Jr., Mercer County Prosecutor, attorney; Ms. Hersh, of counsel and on the briefs).
Appellant filed a pro se supplemental brief.
Before Judges FUENTES, ASHRAFI[1] and NUGENT.
The opinion of the court was delivered by
ASHRAFI, J.A.D.
Defendant Terrence Miller[2] appeals from his conviction by a jury on two counts of third-degree possession of cocaine, N.J.S.A. 2C:35-10a(1); two counts of third-degree possession of cocaine with intent *1056 to distribute, N.J.S.A. 2C:35-5a(1); and one count of third-degree distribution of cocaine, N.J.S.A. 2C:35-5a(1).
The issue we address is whether the fact that defendant did not meet his substituted trial attorney until the morning scheduled for a suppression hearing and trial, by itself, constitutes deprivation of defendant's right to a fair trial, or whether defendant must show that he was prejudiced by the late contact with his trial attorney. Following precedents of our Supreme Court and our own prior decisions, we conclude that defendant is not entitled to a new trial without demonstrating ineffective assistance of counsel or other prejudice. Because defendant has not made either of those showings, we affirm his convictions.
We are not faced with a case where an attorney was first appointed to represent an indigent defendant on the day that a criminal trial was about to begin. Cf. Jablonowski v. State, 29 N.J.Super. 109, 102 A.2d 56 (App.Div.1953) (attorney was appointed to represent the defendant on the morning scheduled for trial and had less than two and a half hours to prepare). Nor is this a case where denying an adjournment "equaled requiring that defendant proceed without counsel" and, thus, defendant "in practice has been denied the right to be represented by counsel." State v. Hayes, 205 N.J. 522, 541, 16 A.3d 1028 (2011).
Defendant was actively represented by counsel from the Public Defender's Office in pretrial proceedings long before the scheduled trial date. Defendant and his attorneys had at least two weeks' notice that trial would begin on Monday, December 10, 2007. For reasons not revealed in our record, managing attorneys at the Public Defender's Office substituted a different Assistant Deputy Public Defender for the staff attorney who had represented defendant in earlier proceedings. At no time did either of the two Assistant Deputy Public Defenders assigned, or the managing attorneys, state to the trial court that they were unprepared to proceed, or request more time to investigate or gather evidence for presentation of a defense.
On December 10, 2007, newly-assigned counsel requested an adjournment because defendant wished to meet with him in "a calmer setting so that we can discuss and plan this particular matter." Counsel stated he had received the file the previous week and had time to review it and prepare for trial. His goal in requesting an adjournment was to develop "rapport" with his client. The trial judge denied the request. Because the central issue on appeal is whether that ruling violated defendant's right to a fair trial, we quote at length the relevant colloquy between defense counsel and the trial judge:
DEFENSE COUNSEL:I just wanted to state on the record, in my conversations with Mr. Miller this morning, because the nature of this change of assignment, this is the first opportunity I've had to meet with him, it goes without saying that Mr. Miller is expressing some
THE COURT: Concern?
DEFENSE COUNSEL:concern. And the reality is, judge, one develops a rapport with one's attorney, and that rapport isn't established on Day 1 when you're ready to start a suppression hearing, and ultimately proceed to trial.
And while I understand it is the Court's intention to call this matter and have this matter proceed to trial, in fairness to Mr. Miller, I think he would best prefer that this matter was adjourned to allow an opportunity for us to sit in ... a calmer setting so that we can discuss and plan this particular matter.
I've advised him that ... the file was provided to me sometime last week, with *1057 an opportunity for me to review and prepare. But to that end, I think Mr. Miller would still prefer that this matter not proceed at this time.
THE COURT: This Court had listed this matter for trial months ago. This isn't a surprise trial date. The Court has discussed the trial date with counsel for the past week or two. I think as much as three weeks ago the Court, or at least two weeks ago, the Court was aware that [former defense counsel] would not be able to try the case. For the record, [former defense counsel] was the original attorney representing Mr. Miller.
The Court was informed that the Public Defender's Office, ... the chief of that office, and ... the assistant chief[] were of the opinion that this case couldn't be tried because it would need new counsel. In fact, the Court was told that.
The Court's response was that under Rule 1:11 it is the Court that decides whether a case is going forward or whether there can be a change of counsel. The Public Defender's Office never came to the Court or said to the Court that it wanted specifically an adjournment, although the Court learned of it through [former defense counsel] ... who said that the higher ups thought that the matter just couldn't go ahead. The Court's response to [former defense counsel] was, well, you can go back and tell them that it is the judge who decides whether an attorney can be relieved, and under what conditions.

Rule 1:11 provides that the Court does not have to grant a request for change of counsel if it is going to delay the trial of the case. Clearly, that is the situation here.
This judge has been trying to get a handle on cases for several months and has been unable to move one for trial due to changes in the Public Defender's Office or the Prosecutor's Office with files. So the Court approximately two weeks ago said this matter is going to trial.
And it said that trying a drug case for a criminal defense attorney is as easy as trying an intersection accident case for a civil trial lawyer. The dispute here is not a difficult one to understand. The police are going to say that Mr. Miller was dealing drugs and they observed him do it in a particular fashion, and that they either saw him deal the drugs or saw him use an intermediary to deal the drugs, but the scenarios are essentially the same in every case. There is nothing difficult or complex about this case.
The Court is electing to hear the suppression motion this morning.... It will pick a jury tomorrow morning. And it will, then, proceed to try the case the balance of the day. The State has only two witnesses of which the Court is aware, unless it has to jump through the hoops of proving chain of custody, that might add a couple of incidental witnesses. But the State's case is simple and short.
....
That means that the defendant has today to prepare for the State's witnesses. Counsel has had the file. Reading a police report doesn't take very long. Meeting with a client doesn't take very long. And defense counsel will be well-prepared to proceed tomorrow.
In terms of producing witnesses, the defense doesn't have to do that until Friday. It strikes the Court that moving the case ahead at this time creates no prejudice to Mr. Miller. What it does do, and the Court will concede this, that Mr. Miller is greeted with some level of discomfort because he hashe has dealt with [former defense counsel]. *1058 But in terms of defending the case, the defendant is prejudiced in no way.
The trial court's ruling resulted in immediately proceeding to a suppression hearing, which was completed that morning.
At that hearing, Trenton Police Officer William Mulryne testified that on the afternoon of August 4, 2006, he was assigned to conduct surveillance of illicit street drug sales. At about 2:30 p.m., Mulryne saw from his concealed location a woman walk up to a man standing on the corner of Martin Luther King Boulevard and Fountain Avenue. He identified the man as defendant Miller. After a brief conversation, defendant walked to a nearby house and reached to the side of a window air conditioner at ground-level. Defendant walked back to the woman and "dropped some objects into her hand." The woman gave defendant what appeared to be paper currency and then walked away. Mulryne believed he had witnessed a hand-to-hand transaction for the sale of an illegal drug.
At 2:48 p.m., Mulryne saw a man, later identified as Joseph McKinney, approach defendant and engage in a brief conversation. Defendant again walked toward and reached up to the air conditioner. He then walked back to McKinney and handed him an unknown object and received paper currency. McKinney walked away from the area. Mulryne called to backup officers to confront and arrest McKinney. They did so and recovered rock cocaine from McKinney.
According to Mulryne's testimony, defendant left the corner of Martin Luther King Boulevard and Fountain Avenue shortly after the exchange with McKinney. About ten minutes later, defendant returned in a black Cadillac and walked into a delicatessen. Defendant was arrested within minutes, and the police seized from his person paper currency in various denominations amounting to $790. An officer also seized a bag containing rock cocaine from the air conditioner that defendant had twice approached.
Defense counsel cross-examined Mulryne, challenging his line of sight to the location of the alleged transactions. Using Mulryne's police report and a photograph of the scene taken by defendant after his arrest, defense counsel questioned Mulryne about his ability to see the individuals involved in the transactions through the branches of trees and other vegetation. He also questioned Mulryne about his reported use of binoculars during the surveillance, although he claimed to be no more than seventy-five feet away. In addition, defense counsel cross-examined Mulryne about the failure of the police to arrest the woman who had engaged in the first transaction and to obtain evidence from her.
Defendant was the only other witness at the suppression hearing. He testified he was not at the scene of the drug transactions but was downtown shopping for clothes at that time. On cross-examination, he said a person he only knew by a familiar name, not his true name, had given him a ride to the delicatessen and would support his testimony that he was downtown that day. The trial judge questioned defendant about his prior criminal record of five indictable convictions. Based on credibility findings in favor of the police officer and against defendant, the judge denied defendant's motion to suppress evidence.
After hearing defendant's testimony, the prosecutor expressed concern that the defense had not provided notice before the trial of a possible alibi defense, as required by Rule 3:12-2. But the prosecutor did not move to bar an alibi defense, and neither attorney requested an adjournment to investigate such a defense.
After the suppression hearing was concluded during the morning, defense counsel *1059 had the remainder of Monday, December 10, to meet with defendant and to plan for the trial beginning the following day. The court had already informed counsel that only the prosecution would need to present evidence the next day. Defense counsel had two additional days to prepare for a defense case because prior judicial commitments prevented the judge from hearing the trial again until Friday of that week.
On Tuesday, December 11, a jury was selected in the morning session. During the afternoon, counsel made opening statements, Officer Mulryne testified before the jury in similar fashion as at the suppression hearing, and defense counsel again cross-examined him about his line of sight and his ability to see and identify the individuals involved in the street transactions.
The State then called one of the officers who had arrested McKinney and defendant. His direct testimony was brief, as was his cross-examination. He testified that he and other officers stopped and arrested McKinney at a location away from the area where the alleged transactions had occurred. As the police approached, McKinney dropped an object to the ground, which the police recovered and found to contain rock cocaine. The officer also testified that he communicated with Officer Mulryne by radio, and then he participated in defendant's arrest at a corner on Martin Luther King Boulevard. He said defendant's arrest occurred about seven minutes after McKinney's arrest, and he found $790 on defendant's person. The officer further testified he found a bag containing rock cocaine concealed on the side of the air conditioner.
Defense counsel cross-examined the second officer about the denominations and nature of the money recovered from defendant, implying that the money was not in a form expected from street sales of illegal drugs. He also questioned the officer about the location of drugs recovered from the air conditioner and the access of other persons to the air conditioner. After the State rested and the jury was excused for the day, defense counsel moved for a judgment of acquittal, which the court denied.
Following the two intervening off-days, the trial resumed on Friday, December 14. Defense counsel came ready with three witnesses for the defense. McKinney testified first and admitted he had on his person a quantity of cocaine when he was arrested on that day. He denied that defendant had sold him the cocaine, testifying as follows:
DEFENSE COUNSEL: And in fact today it is your testimony that Mr. Miller did not sell you that [cocaine]?
MCKINNEY: He never sold me a thing. He don't sell drugs.
On cross-examination, McKinney testified he bought the cocaine on Calhoun Street from a man named "Wooden Head Willie." The prosecutor confronted McKinney with a statement he had given to the police at the time of his arrest, in which he described the location where he had purchased the cocaine as "Willow and Barber Street." McKinney was further impeached through other details in his earlier statement to the police, and he admitted having been convicted in 1986 of two counts of distribution of a controlled dangerous substance and in 1987 of endangering the welfare of a child.
Valerie Dawkins was the next defense witness. Counsel began direct examination by revealing that Dawkins had been convicted in 1998 of forgery. Dawkins testified she saw defendant outside her apartment located on Martin Luther King Boulevard between two and three o'clock on the day of his arrest, but she did not see him "on the corner engaging in any conversations with any individual" during that afternoon. According to Dawkins, defendant *1060 got out of his car and entered the delicatessen carrying "some bags in his hand." The next thing she saw was an unmarked car come up to the corner, some men entered the delicatessen, and they came out a few minutes later with defendant. At some point, more officers arrived in another unmarked car, and those officers searched the alleys on the other side of the street. One officer came out of an alley and said: "I got it." According to Dawkins, defendant immediately said: "That's not mine," to which an officer responded: "It's yours now."
Cynthia White was the third witness called by the defense. White did not have a criminal record. On the day of the arrest, she was in the area around the corner from the delicatessen waiting for her son's father, who had called to say he was coming to give her money for their son. White stated that at about 2:00 to 2:30 that afternoon, she saw defendant get out of a black Cadillac and go inside a store. She testified that "[a]fter a couple of hours standing out there the cops came out there. And they went inside the store and brought him out the store." She described defendant's demeanor at this point as "annoyed" and "mouth[ing] off" to the police officers. The prosecutor's cross-examination included the following testimony:
PROSECUTOR: How did you come to give a statement to Mr. Miller; how does he know you?
WHITE: Well, actually, a couple of months after that happened, I seen Mr. Miller downtown. He was passing out flyers on hisone of his matches, his boxing matches. And I asked what happened on that day, and he begin to tell me. And so he asked me, you know, I said, well, that is wrong, you know, the cops is always harassing people. And he asked me, well, you was there, you know I wasn't doing nothing wrong. I said no, I didn't see you do anything wrong. So actually, yes, I did write that statement, because I don't believe nobody should be behind bars who does not deserve it.
White further testified that she herself had been harassed by the police "a couple of times."
Defendant elected not to testify at the trial. Defense counsel made a closing argument to the jury based on the testimony of defense witnesses and cross-examination of the police officers. He argued that Officer Mulryne did not have clear sight of the area where the alleged drug sales had occurred, and he had incorrectly identified defendant as the person involved. He also argued that any person could have concealed the bag of rock cocaine in the air conditioner.
The jury's deliberations began after the lunch hour on Friday. The jury requested and heard a readback of the testimony of defense witness McKinney and then returned with its verdict the same afternoon, finding defendant guilty on all five counts presented to the jury.
The sentencing hearing was held more than six months later for reasons that are not relevant to this appeal. After appropriate merger of counts, the court sentenced defendant to five years' imprisonment with two years of parole ineligibility. We are informed that defendant has completed serving the period of parole ineligibility and has been released on parole.[3]
*1061 Against this record, defendant raises the following arguments:
POINT ONE
THE TRIAL COURT'S DENIAL OF DEFENDANT'S REQUEST FOR AN ADJOURNMENT DEPRIVED THE DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF LAW.
POINT TWO
THE INSTRUCTION ON DEFENDANT'S EXERCISE OF HIS RIGHT TO REMAIN SILENT SUGGESTED THAT HE HAD AN OBLIGATION TO TESTIFY AND THEREBY VIOLATED HIS STATE AND FEDERAL RIGHTS TO REMAIN SILENT. (Not Raised Below)
Defendant's second point has recently been rejected by our Supreme Court in State v. Dashawn Miller, 205 N.J. 109, 126-27, 13 A.3d 873 (2011).
We focus on the first point, that defendant's trial was unfair and a violation of his due process rights because he first met his substituted assigned attorney on the morning scheduled for his suppression hearing and trial, December 10, 2007. Defendant has not argued he was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution and by Article I, Paragraph 10 of the New Jersey Constitution. Instead, he asserts it is fundamentally unfair to compel a defendant to proceed in a criminal case on the same day that he first meets his assigned trial attorney. We agree that due process requires sufficient time for defense counsel and defendant to confer and prepare, but what is sufficient time is determined by whether defendant has been prejudiced.
Our Supreme Court recently re-confirmed the long line of precedent in our courts holding that a decision to allow or deny an adjournment is discretionary, and a trial court's ruling in that regard will not lead to reversal of a conviction unless the defendant suffered "manifest wrong or injury." Hayes, supra, 205 N.J. at 537-38, 16 A.3d at 1037 (quoting State v. Doro, 103 N.J.L. 88, 93, 134 A. 611 (E. & A.1926), and other precedents). The Court also cited our discussion of the issue in State v. Furguson, 198 N.J.Super. 395, 401, 487 A.2d 730 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 933 (1985), where we stated: "The public has a strong interest in the prompt and effective operation of its judicial institutions. A trial court therefore must have the power to tightly control its own calendar so that the assignment of cases cannot be manipulated by the defense counsel or the defendant." Hayes, supra, 205 N.J. at 537-38, 16 A.3d at 1037-38.[4]
Defendant and our dissenting colleague would dispense with the need to show prejudice when a defendant did not have prior contact with his substituted attorney and was required to proceed on the same day *1062 to a suppression hearing or trial. In such circumstances, it might often be advisable not to proceed immediately over a defendant's objection.[5] The constitutional question, however, is whether defendant was thus deprived of effective assistance of counsel, or otherwise prejudiced in violation of his due process rights.
In the absence of a showing of prejudice, prior cases decided by our Supreme Court and by us establish that defendant is not automatically entitled to a new trial simply because he had seemingly inadequate contact with his attorney. In fact, the circumstances in this case are less compelling than those in State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987), where our Supreme Court declined to hold that the defendant was entitled to a new trial without a showing of specific prejudice. We would deviate from the controlling precedent of Fritz and other cases if we were to adopt defendant's and our dissenting colleague's position.[6]
In Fritz, the Supreme Court considered on direct appeal the defendant's claim that he was deprived of effective assistance of counsel because the trial court refused to grant an adjournment so that his assigned Public Defender could prepare for trial. Id. at 44, 519 A.2d 336. His attorney had represented to the trial court that he had not discussed the case with defendant before the morning of trial, and moreover, the attorney was unprepared to proceed. Id. at 48, 519 A.2d 336. After the trial court denied an adjournment, the defendant was convicted at trial and sentenced to ten years' imprisonment for participating with other youths in an assault upon a Special Police Officer. Ibid.
The facts relevant to the defendant's representation in Fritz were that he had "only sporadic contact with the Public Defender's Office prior to trial." Id. at 47, 519 A.2d 336. An Assistant Deputy Public Defender, Meehan, had spoken to the defendant in December 1982 about a plea bargain, which the defendant refused. The case was then assigned to a different Assistant Deputy Public Defender, and "communications broke down." Ibid. On the morning of trial in May 1983, Meehan appeared on behalf of the defendant and told the court that "his first serious discussion with defendant" had just occurred "that very morning." Id. at 48, 519 A.2d 336. He requested a continuance, admitting that "he was unprepared to try the case." Ibid. In addition, counsel had neither contacted witnesses nor ordered a transcript of the probable cause hearing, at which the victim officer had given exculpatory testimony about the defendant's participation in the assault. Ibid. The trial court denied an adjournment, noting that the first day of trial was only for jury selection and counsel would have "this evening *1063 and tomorrow until nine o'clock to do whatever you are able to do." Ibid.
Considering these facts, our Supreme Court did not hold that the defendant had been denied a fair trial and was entitled to set aside his conviction as a matter of constitutional law, or fundamental fairness. Rather, the Court remanded the matter for a hearing to determine whether the defendant had been prejudiced at trial by his attorney's lack of preparation. Id. at 66-67, 519 A.2d 336. The Court declined to apply a presumption of ineffective assistance of counsel entitling the defendant to a new trial. See id. at 61-63, 519 A.2d 336.
The Court also confirmed the discretionary authority of the trial court to grant or deny an adjournment, and, after citing many precedents, stated: "We are satisfied from this collective judicial experience that the trial court's denial of defendant's motion for a continuance in this case to enable defense counsel to prepare did not completely vitiate the `crucible of meaningful adversarial testing.'" Id. at 63, 519 A.2d 336 (quoting U.S. v. Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657, 666 (1984)). Furthermore, with language reminiscent of the trial court in this case, the Supreme Court stated that the assault, robbery, and weapons charges in Fritz "did not present overly difficult or complicated issues to an experienced criminal trial attorney." Id. at 63, 519 A.2d 336.
The record before us provides less reason to conclude that defendant's trial was per se unfair than the Supreme Court had in Fritz. The second Assistant Deputy Public Defender in this case stated he had received the file "last week, with an opportunity. . . to review and prepare." In addition, his use of the police report and a photograph provided by defendant showed that he had conferred with defendant and had prepared a strategy for the suppression hearing and trial.
The trial itself was not beginning until the next day, and the court's schedule gave defense counsel an intervening afternoon and two additional days to meet with defendant, to plan further strategy, and to seek witnesses and evidence for the defense. Denial of an adjournment on December 10 only resulted in proceeding that day to a suppression hearing with doubtful significance in the case.[7] Defense counsel never claimed he was unprepared or needed an adjournment for anything other than to develop "rapport" with his client and to allay his client's "concerns." The court's ruling was more accommodating to defendant and counsel than the ruling in Fritz, which nevertheless did not lead the Supreme Court to reverse the defendant's conviction without a further showing of ineffective assistance and prejudice.
Similarly, in State v. Garcia, 195 N.J. 192, 949 A.2d 208 (2008), the Supreme Court did not find sufficient ground to reverse the defendant's conviction, although it concluded the trial court had abused its discretion in denying a brief adjournment so that defense counsel could produce an incarcerated witness to testify on behalf of the defendant at trial. Id. at 198-99, 205, 949 A.2d 208. There, the denial of an adjournment implicated the *1064 same provisions of the federal and State constitutions as in this case.[8] Instead of reversing the conviction, the Supreme Court remanded to the trial court to determine whether the constitutional violation had prejudiced the defendant's right to a fair trial. See id. at 207, 949 A.2d 208.
Our own prior decisions have also not found fundamental unfairness in compelling a defendant to stand trial despite lack of adequate contact with a new attorney. In Furguson, supra, 198 N.J.Super. at 405, 487 A.2d 730, the defendant had previously been represented by competent counsel from the Public Defender's Office and had timely notice of the trial date but had belatedly obtained funds to retain private counsel. Newly-retained defense counsel first learned that the Monday trial schedule was firmly fixed when he arrived that same morning to seek an adjournment. The defendant had learned the previous Friday afternoon that the trial was proceeding but was unable to contact his new attorney that afternoon. Although the new attorney had met with the defendant and represented him in other proceedings several days before the trial, he was admittedly unprepared to defend him for the more serious robbery trial. Id. at 403-05, 487 A.2d 730. The trial court denied the request for adjournment, and the defendant was convicted of first-degree robbery. On appeal, we held the trial court's refusal to grant even a one-day adjournment did not require reversal of the defendant's conviction. Id. at 398, 402-03, 487 A.2d 730.
In State v. Rodriguez, 254 N.J.Super. 339, 341-42, 603 A.2d 536 (App.Div.1992), the defendant was tried and convicted of charges involving assault of his former girlfriend. The Assistant Deputy Public Defender who represented him at trial was not the same one who had represented the defendant in pretrial proceedings. The defendant had informed his prior Public Defender that the complaining victim had come to visit him at the jail after his arrest, thus calling into question her claims of violent assaults and other crimes upon her committed by the defendant. The substituted trial attorney only learned that information after the trial began. Id. at 344, 603 A.2d 536. Trial counsel requested a brief adjournment so that she could obtain jail records to impeach the testimony of the victim. The court refused to grant an adjournment, and the defendant was convicted. Ibid. We held it was error for the trial judge to refuse a brief adjournment, but the conviction would not be reversed because "in order to set aside a conviction, it must appear that the judge's exercise of discretion resulted in prejudice." Id. at 346, 603 A.2d 536.
Although each of these cited cases involved important constitutional rights of a defendant to present a defense, in each case both the Supreme Court and our own decisions required a showing of prejudice. In this case, our dissenting colleague concedes "the absence of direct prejudice" on the record presented, post at 99, 18 A.3d at 1069, but would hold as a matter of fundamental fairness that a court may not proceed as scheduled in the face of knowledge that a defendant has met his appointed attorney for the first time that day.
We do not dispute the statement that a fair system of criminal justice allows time for a defendant to meet with his attorney and to prepare his defenses. But defendant in this case was not summoned to stand trial in peremptory proceedings without adequate notice or time to obtain representation and to prepare. Defendant may have been concerned by the substitution *1065 of a different attorney for the one who had represented him previously, and he may have lacked confidence in the new attorney, but those facts by themselves do not establish that he received less than effective assistance of counsel or was otherwise prejudiced at the suppression hearing or at trial.
Nothing in the federal or State constitutions guarantees a criminal defendant good rapport with or confidence in his defense attorney. The constitutional guarantee is of effective assistance of counsel, not familiarity and confidence. The standard for determining whether a defendant has received that constitutional right has a long history of case law, most prominently enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Fritz, supra, 105 N.J. 42, 519 A.2d 336. To overturn a conviction, a defendant must show he has been prejudiced.
In countless post-conviction applications alleging ineffective assistance of counsel, convicted defendants have described ways that a criminal defense attorney did not fulfill their expectations. Even after meetings and full opportunity to plan a defense strategy, a defendant facing trial may feel uncomfortable with his attorney, whether court-appointed or retained, and both may wish for better rapport. But the test of a fair trial and conviction is whether the attorney performed in accordance with the constitutional guarantee of counsel, and also whether any deficient performance of the attorney that has been shown prejudiced the defense. Strickland, supra, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The attorney that the defendant first meets on the morning of a hearing or trial may perform more effectively in his defense than the attorney who has developed a good relationship with the defendant but is inadequately prepared, lacks experience to devise good strategy, or simply makes poor decisions.
The dissent pursues a commendable objective of enhancing the appearance of fairness in the criminal justice system. It asserts we have not only the authority but a non-delegable duty and obligation to correct a wrong "to guarantee the proper administration of justice." Post at 99, 18 A.3d at 1069. However, not even the decisions of our Supreme Court the dissent cites attempted to impose a fixed rule of procedure for every case.[9]
*1066 The dissent also draws a distinction between indigent and financially able defendants, post at 83-85, 18 A.3d at 1059-60, but nothing presented to us suggests that defendant in this case received inferior representation at trial because he required the services of the Public Defender's Office. We have no reason to conclude that defendants represented by the Public Defender's Office in New Jersey suffer a disadvantage. Furthermore, those with modest financial ability to retain private counsel, such as the defendant in Furguson, supra, 198 N.J.Super. 395, 487 A.2d 730, for example, do not always control an attorney's availability to meet or to prepare.
As judges hearing one case with its own set of facts, we overstep our powers if we devise generally applicable rules without focusing on what the record shows in the case before us. To illustrate the point, we have no information on this record about the practices of court-appointed counsel and the private bar in covering pretrial hearings or municipal court matters for fellow counsel. Yet, our dissenting colleague's view would restrict a trial court's ability to proceed in such circumstances.
Our Supreme Court might choose, either by decision or rule, to prohibit a trial court from proceeding as scheduled when an attorney states he has only met his client that same day, but it has not previously done so. Fritz suggests that a client's opportunity to develop confidence in or rapport with his appointed attorney is not the standard that we must apply in assessing the fairness of the proceedings.
The record before us does not demonstrate prejudice in the representation provided by the Assistant Deputy Public Defender or otherwise at trial. Despite the passage of time, defendant has not produced any evidence that particular witnesses or evidence were overlooked because the suppression hearing began the same day and the trial the following day after he first met his substituted trial attorney. He has not demonstrated any aspect of the hearing or trial that would have been conducted differently if only defendant had met earlier with his new attorney.
Considering the substantial post-trial delay until sentencing, defendant had further opportunity to present evidence to the trial court that his defense had been prejudiced. He made no such showing.[10] We make no determination in this appeal as to whether defendant may yet present evidence in a proper application to the trial court under Rule 3:22 and applicable case law for post-conviction relief alleging ineffective assistance of counsel or other due process violation. We only conclude that the record and arguments before us do not show prejudice in denial of an adjournment on the scheduled date fixed earlier for defendant's suppression hearing and trial.
Affirmed.
*1067 FUENTES, J.A.D., dissenting.
The central issue raised in this appeal concerns the propriety of the trial court's decision to deny defendant's request to adjourn the trial in order to permit him to discuss the case with the attorney who had been assigned to represent him by the local Office of the Public Defender. It is undisputed that defendant had not met this attorney at any time prior to the day the case was scheduled for trial. It is equally undisputed that defendant did not play any role in the decision made by the local Office of the Public Defender to replace the attorney who had been representing him up to that point.
The trial judge denied defendant's request to adjourn the trial after noting that the attorneys of record in the case had been informed that the case was scheduled for trial on a peremptory basis. The judge took particular exception that no one from the Public Defender's Office had requested permission from the court to substitute the assigned counsel for defendant pursuant to Rule 1:11-2(a)(2).
Despite these undisputed facts, the majority affirms defendant's conviction relying on the well-established, yet in this case irrelevant proposition, that defendant cannot show how the trial court's decision prejudiced his right to effective assistance of counsel under the two-prong standard establish by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987).
The parties in this appeal were directed by this court to provide additional briefing addressing whether, under the circumstances presented, the trial court's denial of defense counsel's motion to adjourn the trial denied defendant fundamental fairness and due process of law. These are the principles that guide my analysis.
I deem it self-evident that a rational and just criminal justice system cannot accept as valid a conviction predicated on a scenario in which a defendant, through no fault of his or her own, meets his or her lawyer for the first time on the day the case is scheduled for trial. I emphasize that this defendant played no role in the decision made by the Office of the Public Defender to replace his previously assigned counsel. This is not a case in which a defendant is trying to "play the system" by attempting to discharge his lawyer in a manner intended to frustrate the administration of justice.
This case came to trial on December 10, 2007. After describing for the record the charges facing defendant, the trial judge asked the prosecutor whether the State was prepared to proceed on defendant's pending motion to suppress evidence "seized as a result of a warrantless search." The prosecutor informed the court that Detective Mulryne was present and ready to testify at the evidentiary hearing. This prompted the following colloquy between the trial judge and defense counsel:
DEFENSE COUNSEL:I just wanted to state on the record, in my conversations with Mr. Miller this morning, because the nature of this change of assignment, this is the first opportunity I've had to meet with him, it goes without saying that Mr. Miller is expressing some
THE COURT: Concern?
DEFENSE COUNSEL:concern. And the reality is, judge, one develops a rapport with one's attorney, and that rapport isn't established on Day 1 when you're ready to start a suppression hearing, and ultimately proceed to trial.
And while I understand it is the Court's intention to call this matter and have this matter proceed to trial, in fairness *1068 to Mr. Miller, I think he would best prefer that this matter was adjourned to allow an opportunity for us to sit in . . . a calmer setting so that we can discuss and plan this particular matter.
I've advised him that . . . the file was provided to me sometime last week, with an opportunity for me to review and prepare. But to that end, I think Mr. Miller would still prefer that this matter not proceed at this time.
THE COURT: This Court had listed this matter for trial months ago. This isn't a surprise trial date. The Court has discussed the trial date with counsel for the past week or two. I think as much as three weeks ago the Court, or at least two weeks ago, the Court was aware that [former defense counsel] would not be able to try the case. For the record, [former defense counsel] was the original attorney representing Mr. Miller.
The Court was informed that the Public Defender's Office, . . . the chief of that office, and . . . the assistant chief[] were of the opinion that this case couldn't be tried because it would need new counsel. In fact, the Court was told that.
The Court's response was that under Rule 1:11 it is the Court that decides whether a case is going forward or whether there can be a change of counsel. The Public Defender's Office never came to the Court or said to the Court that it wanted specifically an adjournment, although the Court learned of it through [former defense counsel] . . . who said that the higher ups thought that the matter just couldn't go ahead.

The Court's response to [former defense counsel] was, well, you can go back and tell them that it is the judge who decides whether an attorney can be relieved, and under what conditions.

Rule 1:11 provides that the Court does not have to grant a request for change of counsel if it is going to delay the trial of the case. Clearly, that is the situation here.
This judge has been trying to get a handle on cases for several months and has been unable to move one for trial due to changes in the Public Defender's Office or the Prosecutor's Office with files. So the Court approximately two weeks ago said this matter is going to trial.

And it said that trying a drug case for a criminal defense attorney is as easy as trying an intersection accident case for a civil trial lawyer. The dispute here is not a difficult one to understand. The police are going to say that Mr. Miller was dealing drugs and they observed him do it in a particular fashion, and that they either saw him deal the drugs or saw him use an intermediary to deal the drugs, but the scenarios are essentially the same in every case. There is nothing difficult or complex about this case.
The Court is electing to hear the suppression motion this morning. . . . It will pick a jury tomorrow morning. And it will, then, proceed to try the case the balance of the day. The State has only two witnesses of which the Court is aware, unless it has to jump through the hoops of proving chain of custody, that might add a couple of incidental witnesses. But the State's case is simple and short.
. . . .
That means that the defendant has today to prepare for the State's witnesses. Counsel has had the file. Reading a police report doesn't take very long. Meeting with a client doesn't take very long. And defense counsel will be well-prepared to proceed tomorrow.
In terms of producing witnesses, the defense doesn't have to do that until *1069 Friday. It strikes the Court that moving the case ahead at this time creates no prejudice to Mr. Miller. What it does do, and the Court will concede this, that Mr. Miller is greeted with some level of discomfort because he hashe has dealt with [former defense counsel]. But in terms of defending the case, the defendant is prejudiced in no way.
[(Emphasis added).]
The court then proceeded to the evidentiary hearing on defendant's motion to suppress. The trial began on December 11, 2007, and resumed and ended three days later on December 14, 2007.
It is well-settled that a trial court's decision to allow an adjournment is discretionary and is reversible only upon "a showing of an abuse of discretion causing defendant a manifest wrong or injury." State v. Furguson, 198 N.J.Super. 395, 402, 487 A.2d 730 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 933 (1985). Ordinarily, "in order to set aside a conviction, it must appear that the judge's exercise of discretion resulted in prejudice." State v. Rodriguez, 254 N.J.Super. 339, 346, 603 A.2d 536 (App.Div.1992).
I am satisfied that, under the circumstances presented, the trial court mistakenly exercised its discretion in denying defendant's request to adjourn the trial to permit him more time to meet and discuss the case against him with his newly appointed defense counsel. Despite the absence of direct prejudice, the court's decision in this context fundamentally impugned the integrity of the trial, casting a shadow of unfairness over the proceedings that, in my view, can only be removed by a new trial.
Our authority, indeed obligation, to correct this wrong emanates from our non-delegable duty "to guarantee the proper administration of justice . . . and, particularly, the administration of criminal justice." State v. Williams, 93 N.J. 39, 62, 459 A.2d 641 (1983) (citations omitted). As the Court noted in State v. Cook, 179 N.J. 533, 561, 847 A.2d 530 (2004), "Our courts . . . have the independent obligation to take all appropriate measures to ensure the fair and proper administration of a criminal trial." To carry out this obligation, this court is vested with the power to fashion appropriate remedies to correct injustices in the manner criminal trials are conducted. Ibid. Where appropriate measures are available, "they should be employed to the fullest extent feasible to enhance the fairness of proceedings." Id. at 562, 847 A.2d 530.
In State v. Baker, 310 N.J.Super. 128, 138, 708 A.2d 429 (App.Div.1998), Judge Pressler noted that "the principle of fundamental fairness, standing alone as a ratio decidendi, is an amorphous doctrine," rendering its bounds tethered to a fact-sensitive analysis. Writing for a unanimous Court in State v. Sugar, 84 N.J. 1, 15, 417 A.2d 474 (1980), Justice Pashman noted that fundamental fairness relates to "our concern for judicial integrity," which "extends even to its mere appearance." Thus, "we have employed the notion of fundamental fairness to strike down official action that does not itself violate due process of law." Ibid. Given a clear need to redress a wrong, the doctrine of "fundamental fairness on occasion requires that a court prohibit conduct that does not transgress the Constitution." Ibid.
Invoking the doctrine of fundamental fairness, our Supreme Court has reversed a conviction for possession of cocaine with intent to distribute and ordered a new trial in a case where a criminal defendant did not have access to amenities in jail, such that he had to appear in court "in a visibly disheveled state," because his appearance could have affected his credibility. State v. Maisonet, 166 N.J. 9, 13, 19-21, 763 A.2d 1254 (2001).
*1070 Reversing defendant's conviction here does not depart from the principles we articulated in Furguson. I fully recognize the trial court's authority to manage the proceedings in this case, including "the power to tightly control its own calendar so that the assignment of cases cannot be manipulated by the defense counsel or the defendant." Furguson, supra, 198 N.J.Super. at 401, 487 A.2d 730; see also R. 1:11-2. I acknowledge that "when a defendant fails to act expeditiously in obtaining counsel of his own choice, the trial court must have the power to do what is reasonably necessary to meet the situation." Ibid. (internal quotations and citations omitted). There is nothing in this dissent that undermines or departs from the approach expressed in Furguson:
The procedure that may generally be employed where defendant seeks to change counsel is to allow a reasonable adjournment to permit the defendant to retain counsel of his own choice. The granting of a continuance necessarily rests within the sound discretion of the trial court, and the exercise of that discretion will not constitute reversible error in the absence of a showing of an abuse of discretion causing defendant a manifest wrong or injury.

[Id. at 402, 487 A.2d 730 (Emphasis added).]
By contrast, I emphasize here that defendant did not seek to adjourn the trial to obtain new counsel. The substitution of counsel occurred as a result of a decision reached by the supervisory staff of the local Office of the Public Defender. Although defendant was the person most affected by this decision, he was not consulted or asked to participate in any way. As the trial court itself recognized, defendant had been interacting with the staff attorney assigned by the Office of the Public Defender since the start of this case and had the right to expect that this attorney was the one who would represent him at trial. Substitute counsel's "appearance" on the day of trial took defendant by surprise.
Under these circumstances, the court's focus should have shifted to those responsible for this situationthe staff attorney originally assigned to represent defendant and the management staff of the local Public Defender's Office. The staff attorney, and if necessary the management of the Public Defender's Office, had a duty under Rule 1:11-2(a)(2) to seek leave from the court, with notice to defendant, to substitute counsel at this late stage of the proceedings. If such a motion had been filed, the court could have then determined whether substitution was warranted, and most importantly from defendant's perspective, assess the impact the substitution would have on defendant's right to effective assistance of counsel.
I also note that at least two weeks before the scheduled trial date, the management staff of the Office of the Public Defender "informed" the court in some fashion that the staff attorney assigned to defendant could not continue to represent him in this case. Despite this, the court decided to strictly enforce the requirements of Rule 1:11-2(a)(2) to defendant's detriment. Stated differently, although the Office of the Public Defender clearly erred by not seeking formal leave of the court to substitute counsel as required by Rule 1:11-2(a)(2), the court likewise erred in failing to protect defendant's right to a fundamentally fair trial by failing to act in a timely fashion to ensure that, if new defense counsel was indeed required, defendant would have sufficient time to meet and discuss his case with his new attorney well in advance of trial. In this procedural breakdown between the trial court and the Office of the Public Defender, both participants *1071 lost sight of defendant's right to a fundamentally fair trial.
In Ake v. Oklahoma, 470 U.S. 68, 76, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53, 61 (1985), Justice Marshall noted:
This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.
As a result of his financial inability to hire private counsel, defendant gave up his right to choose his own counsel and was forced to rely on the attorney provided by the Public Defender's Office. In establishing the Public Defender's Office, the Legislature
declared to be the policy of this State to provide for the realization of the constitutional guarantees of counsel in criminal cases for indigent defendants by means of the system and program established and authorized by this act to the end that no innocent person shall be convicted, and that the guilty, when convicted, shall be convicted only after a fair trial according to the due process of the law.

[N.J.S.A. 2A:158A-1 (emphasis added).]
By denying defendant's request for an adjournment of the trial under these circumstances, the trial court not only failed to hold those responsible for the disruption of the proceedings accountable, but also inadvertently permitted the internal management decisions of the Office of the Public Defender to create the appearance of two tiers of legal representation: one for those defendants who can control their attorneys' actions through the power of the purse string, and another for those who, because of their poverty, are at the mercy of staff attorneys beholden to their supervisors.[11] Such a prospect was not envisioned nor intended by the Legislature when it established the Public Defender's Office.
Finally, as a fellow judge, I understand the trial court's frustration in this case. Judicial resources should not be needlessly consumed and case management orders must be enforced lest they become a perfunctory exercise devoid of both substance and meaning. I am nevertheless compelled to note that "trying a drug case" bears no comparison to "trying an intersection accident case." Although both kinds of cases are indisputably deserving of the utmost professional care, the latter risks only monetary compensation to a civil litigant, with the prospect of an alternative source of recovery from a negligent lawyer, while the former imperils a person's freedom, the loss of which can never be restored or adequately compensated.
No matter how seemingly routine certain criminal trials may seem to those of us who labor in the judiciary, the prospect of losing one's freedom is never routine, nor can the awesome power of depriving a person of liberty ever be wielded without great care and respect. Similarly for lawyers, no matter how adroit a criminal defense attorney may be, each case brings with it unique challenges, not the least of *1072 which is developing what defense counsel referred to here as a "rapport" with the client, who has entrusted his or her freedom to that lawyer. Whether the charges involve possession of illicit drugs or murder, those of us in the criminal justice system must treat each case with the same level of care and commitment to justice.
I began this dissent by describing the need for reversal here as "self-evident." I conclude with a brief elaboration of that proposition. Our Supreme Court has characterized the attorney-client relationship as "a fiduciary one, involving the highest trust and confidence." In re Brown, 88 N.J. 443, 448-449, 443 A.2d 675 (1982). Between a defendant and criminal defense counsel, confidence and trust are qualities developed and nurtured by time and events. The lawyer must have the time necessary to explain to the client the intricacies of the legal process, review the evidence in the case, and agree upon a trial strategy in a manner that fosters "the highest trust and confidence." Ibid. How much time is needed for these essential aspects of the attorney-client relationship to develop must always be a case by case determination. Under the facts presented here, I am satisfied that defendant was not provided the time necessary to develop such a relationship with his counsel. See Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940) (expressing concern for perfunctory appointments of counsel).
Every once in a while a case comes before this court that tests our resolve as judges to remain true to the fundamental principles that set this great country apart from the rest of worldour commitment to the fundamental concept of fairness, a sense that justice was done, both in fact and in the manner it is perceived by those most affected by it. A system of criminal justice that permits a conviction to stand in a case where an indigent man, through no fault of his own, meets his attorney for the first time on the day the case is scheduled for trial, carries with it the indicia of a "show trial," a sham proceeding in which the outcome is perceived as predetermined. Because we are better than that, I respectfully dissent.
NOTES
[1] Judge Gilroy was on the panel when this appeal was listed for disposition without oral argument on November 4, 2010. Judge Ashrafi was substituted for Judge Gilroy when the case was rescheduled for oral argument.
[2] Although the spelling of defendant's name in the indictment and other court documents is "Terrence," it appears from signatures on the notice of appeal and other documents that defendant spells his name "Terrance." In testimony before the trial court, defendant stated he prefers to use the name "Culture Supreme El Bey."
[3] The Judgment of Conviction states that the sentence on count four was "an extended term of five (5) years" and the other sentences concurrent with count four. At the sentencing hearing, however, the court stated it was denying the State's motion for a discretionary extended term sentence. Because defendant has not raised the issue, and neither the length of the prison term nor parole eligibility was affected, we will not address further the apparent error in the Judgment of Conviction. Defendant may request correction of the Judgment in an application to the trial court.
[4] In Hayes, supra, 205 N.J. at 539-40, 16 A.3d at 1038-39, the Supreme Court held that the trial court had abused its discretionary authority in denying an adjournment and that the defendant had been prejudiced as a result. The defendant had sought an adjournment so that he could secure new counsel to pursue a motion to withdraw his guilty plea. The Supreme Court found prejudice because prior defense counsel perceived a conflict of interest and could not effectively represent defendant for that motion. The conflict forced the defendant to proceed on the motion without the aid of counsel. Id. at 540, 16 A.3d at 1039. The Court remanded the matter to the trial court to hold a hearing with new counsel on whether defendant was entitled to withdraw his guilty plea. Id. at 541-42, 16 A.3d at 1039-40. Here, defendant Miller was always represented by conflict-free counsel asserting that he was ready and able to represent defendant at the suppression hearing and trial.
[5] In this case, a brief adjournment of the suppression hearing for an hour or two could have been granted to allow counsel and defendant to confer. The court could then have inquired further to determine whether any meritorious reason for a longer adjournment had developed. But defense counsel made no such request for a brief adjournment, and the court itself did not suggest it. As the Supreme Court stated in Hayes, supra, "a mere difference in judicial opinion concerning the feasibility, expediency or pragmatical propriety of a ruling is [not] synonymous with abuse of judicial discretion." 205 N.J. at 539, 16 A.3d at 1038 (quoting Smith v. Smith, 17 N.J.Super. 128, 133, 85 A.2d 523 (App.Div. 1951), certif. denied, 9 N.J. 178, 87 A.2d 387 (1952)).
[6] Cf. State v. Zied, 116 N.J.L. 234, 237-39, 183 A. 210 (E. & A. 1936) (cited in Hayes, supra, 205 at 537-38, 16 A.3d at 1037) (Although due process of law would have been better served if appointed counsel had been granted an adjournment to allow more than four days to prepare for a murder trial, the Court's review of the record found no prejudice to defendant in proceeding with the trial as scheduled.).
[7] We cannot be certain from the available record what specific evidence defendant was seeking to suppress and on what ground. Defense counsel's oral argument at the suppression hearing was that the police had misidentified defendant as the person who conducted the hand-to-hand drug transactions, and the drugs recovered from the air conditioner could have been placed there by any number of persons. Misidentification, however, was an issue for the jury to determine at trial. It did not address a constitutional violation requiring suppression of evidence seized from McKinney and from a window air conditioner. It appears that the only evidence that might have been suppressed based on the defense arguments was the $790 seized from defendant's person.
[8] A defendant's right to compulsory process to compel witnesses to testify on his behalf is also protected by the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution.
[9] In State v. Williams, 93 N.J. 39, 70-71, 459 A.2d 641 (1983), the Court established a balancing rule to address the conflict between the rights of the public to open criminal court proceedings and the rights of a defendant to a fair trial, but the Court also acknowledged the issue may arise in "a wide, almost limitless variety of situations," and it urged further "continuing study to be undertaken" by the Court's rule committees in devising appropriate procedures. Likewise, in State v. Cook, 179 N.J. 533, 562, 847 A.2d 530 (2004), the Court recognized that a proposed rule requiring the recording of confessions was "important and nuanced, and should be addressed in a context broader than that permitted in any one criminal appeal." The Court stated that because "[t]he balancing of interests will require careful and deliberate study," it would establish a committee to study and make recommendations before announcing a generally-applicable rule through the exercise of its supervisory authority over criminal trials. Ibid.

Also unhelpful to the dissent's position is its citation to Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940), in support of its concern for "perfunctory appointments of counsel." Post at 104, 18 A.3d at 1072. In Avery, two attorneys had been appointed to represent the defendant in a capital case just three days before he stood trial, and the attorneys claimed they had insufficient time to prepare a defense. Id. at 447-49, 60 S.Ct. at 322-23, 84 L.Ed. at 380-81. The United States Supreme Court reviewed the record of the defendant's trial and unanimously concluded that the defendant had not been prejudiced by the late appointment of counsel. Id. at 448-53, 60 S.Ct. at 323-25, 84 L.Ed. at 380-83. We do not suggest that the Court today would affirm a capital conviction on similar facts, only that even such a drastic outcome has historically required a review of the actual record of the case.
[10] Defendant had filed a post-trial pro se motion to set aside the jury's verdict and to grant him a new trial. In papers submitted with that motion, defendant stated he did not trust his trial attorney and claimed that as many as twenty witnesses might have aided his defense, but he did not identify any additional witnesses besides the three who were called to testify. At the sentencing hearing, defendant's third attorney stated he was unaware of defendant's pro se motion, and the trial judge never ruled on it.
[11] See J. Aalberts, Thomas Boyt, and Lorne H. Seidman, Public Defender's Conundrum: Signaling Professionalism and Quality in the Absence of Price Robert, 39 San Diego L.Rev. 525 (2002).